EL PUEBLO DE PUERTO RICO, y en su representación RAFAEL SANCHO BONET, TESORERO DE PUERTO RICO, demandante y apelante, *v.* RUSSELL & Co., S. EN C., demandada y apelada.

Núm. 7466.—*Sometido:* Noviembre 22, 1939. *Resuelto:* Marzo 15, 1940.

Hon. Procurador General George A. Malcolm (B. Fernández García, Ex-Procurador General, en el alegato) y E. Campos del Toro, Procurador General Auxiliar, abogados del apelante; R. Castro Fernández y José López Baralt, abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR WOLF emitió la opinión del tribunal.

En 1926 Russell & Co. radicó una solicitud de *injunction* para impedir que el Tesorero de Puerto Rico cobrara ciertas contribuciones. En marzo 4, 1927, el Congreso decretó que:

"Sección 48.—El Tribunal Supremo y las Cortes de Distrito de Puerto Rico y los respectivos Jueces de los mismos podrán conceder autos de hábeas corpus en todos los casos en que dichos autos puedan concederse por los Jueces de las Cortes de Distrito de los Estados Unidos, y las Cortes de Distrito podrán conceder autos de *mandamus* en todos los casos oportunos.

"No podrá sostenerse en la Corte de Distrito de los Estados Unidos para Puerto Rico pleito alguno con el fin de restringir la tasación o cobro de contribución alguna impuesta por las leyes de Puerto Rico." 44 Stat. 1418, 1421.

Por una ley posterior decretó además que cualquier contribución que permaneciera insoluta debido a un procedimiento de *injunction* podría ser cobrada, no en la forma ordinaria administrativa, sino mediante un pleito. El Tesorero radicó demanda contra Russell & Co. en 24 de junio de 1930 para cobrar la contribución, ante la Corte de Distrito de San Juan. La demandada solicitó el traslado y la causa fué trasladada a la Corte de Distrito de los Estados Unidos a base de diversidad de ciudadanía. El caso fué visto allí y se dictó sentencia en favor de la demandada. El Pueblo de Puerto Rico apeló para ante la Corte de Circuito de Apelaciones para el Primer Circuito, la que confirmó la sentencia de la Corte de Distrito Federal. *People* v. *Havemeyer et al.*, 60 F. (2d) 10. El Pueblo acudió ante la Corte Suprema

de los Estados Unidos con un recurso de *certiorari* y esa corte revocó a la de Circuito de Apelaciones y a la Federal de Distrito fundada en que no existía diversidad de ciudadanía. *People of Puerto Rico* v. *Russell & Co.*, 288 U.S. 476, 77 L. Ed. 903.

El caso fué devuelto a la Corte de Distrito Territorial. Luego de celebrado el juicio, esa corte decidió el caso siguiendo el curso trazado por la Corte de Circuito de Apelaciones al confirmar a la Corte de Distrito Federal. El Pueblo apeló en diciembre de 1935, mas no fué hasta el 8 de febrero de 1937 que se radicó la transcripción de autos. Las partes presentaron sus alegatos el 3 de agosto de 1937 y el 2 de mayo de 1938. El 4 de mayo de 1938 se celebró una vista y el 22 de noviembre de 1939 una segunda vista.

Los hechos del caso son como sigue:

Russell & Co. es dueña o arrendataria de seis grandes plantaciones de caña de azúcar ubicadas en la parte sur de la Isla. Cada una de estas plantaciones o fincas disfruta de ciertos derechos de agua a virtud de concesiones de la Corona de España, el soberano anterior. Estas concesiones consisten en el derecho a tomar ciertas cantidades de agua del Río Jacaguas para fines de regadío.

En 18 de septiembre de 1908 la Asamblea Legislativa aprobó una ley que se encuentra en las Leyes de 1909, pág. 153 (Compilación 1911, Secs. 1042–1082), para crear un distrito de riego al sur de la Isla, y esa ley estableció un sistema completo de regadío para aquel distrito. De conformidad con dicha ley los terratenientes dentro del distrito pagarían cierta contribución por cada cuerda de terreno. También se proveía la adquisición de los derechos de agua por expropiación forzosa, compra o permuta de los mismos por crédito contra la contribución, de los terratenientes de tales propiedades. Por la Ley núm. 128 de agosto 8, 1913, Sesión Extraordinaria, pág. 53, se autorizó al Comisionado del Interior, entre otras cosas, para negociar con el dueño

de concesiones de agua que no las hubiera cedido, vendido o transferido en alguna otra forma al distrito de regadío. El 26 de agosto de 1914 Russell & Co. y los dueños de las fincas que aquéllos poseían en calidad de arrendatarios celebraron contratos con el Comisionado del Interior, a virtud de los cuales las concesiones o derechos de agua fueron suspendidos y convinieron éstos en recibir del sistema de riego cierta cantidad de agua a cambio de los mismos. El 8 de julio de 1921 la Asamblea Legislativa aprobó la Ley núm. 49 (Leyes de 1921, pág. 367), por la cual se gravaron cualesquiera terrenos dentro del distrito de regadío que no habían sido objeto de la contribución. Es ésta precisamente la contribución que el demandante está tratando de cobrar.

También debe hacerse constar que Russell & Co., con motivo de sus contratos de arrendamiento, viene obligada a pagar las contribuciones impuestas a las tierras que posee a tenor de tales arrendamientos, y, de declararse que la contribución es constitucional, tiene que pagarla sobre cada una de las seis fincas.

Debe darse cuidadosa atención al razonamiento de la Corte de Circuito de Apelaciones, supra, aunque bajo las circunstancias el mismo no es obligatorio.

La demandada sostenía que la Ley núm. 49 de 1921 era nula e inconstitucional y que la acción había prescrito. La corte inferior declaró que la ley era inconstitucional, siguiendo el razonamiento de la Corte de Circuito de Apelaciones, no dictó resolución alguna en cuanto a la prescripción, y dijo, a manera de *dictum:*

". . . No obstante, diremos que de ser válida y constitucional la Ley Núm. 49 de la Asamblea Legislativa de Puerto Rico de 8 de julio de 1921, la Ley Núm. 302 citada sería aplicable solamente a las contribuciones cuya recaudación se había impedido mediante *injunction* pendiente en 4 de marzo de 1927, cuando fué aprobada la Ley enmendatoria del Art. 48 del Acta Orgánica, pero no a las impuestas después, comprendiendo la demanda enmendada del presente

caso el cobro de contribuciones desde los años 1922–1923 al 1933–1934, ambos inclusive.''

El apelante señala tres errores, a saber:

''1.—La Corte de Distrito de San Juan erró al declarar nula y anticonstitucional la Ley Núm. 49 de fecha 8 de julio de 1921, por los fundamentos de la sentencia dictada por la Corte de Circuito de Apelaciones para el Primer Circuito de los Estados Unidos (*People of Puerto Rico* v. *Havemeyer et al.*, 60 F. (2d) pág. 10), a saber:

''A.—Porque dicha ley delega poderes legislativos en el Comisionado del Interior en lo referente a la imposición de la contribución especial que fija el estatuto a los terrenos que reciben los beneficios del sistema de riego.

''B.—Porque menoscaba el valor de las obligaciones nacidas de los contratos celebrados en 26 de agosto de 1914 entre El Pueblo de Puerto Rico y la demandada o sus antecesores en título.

. ''2.—La Corte de Distrito de San Juan erró al declarar que no está justificada la imposición de la cuota o contribución especial mientras los contratos consignados en la escritura Núm. 20 de fecha 8 de junio de 1916, otorgada ante el Notario Frank Antonsanti estén vigentes y no se renuncien, abandonen, rindan o expropien los derechos de agua otorgados por la Corona de España a la demandada. o sus predecesores en título.

''3.—La Corte de Distrito de San Juan erró al no condenar a la demandada a pagar el importe de la contribución especial que se cobra en la demanda.''

Los tres errores serán considerados ahora.

 A nuestro juicio no existe una indebida delegación de poderes. El Comisionado del Interior fija los cargos por agua cada año haciendo un cálculo definitivo. Aun si el estatuto no determinara específicamente la computación de los cargos no decidiríamos que ello equivalía a una indebida delegación de poderes.

''Las cortes han sostenido la validez de estatutos que autorizan a distritos de regadío y a otros distritos organizados para el mismo fin a imponer contribucines y cuotas (*assessments*) y tales estatutos no caen dentro de las disposiciones constitucionales que regulan la imposición y cobro de contribuciones para fines generales del estado.'' 67 C. J. 1337, párr. 925.

El texto está sostenido por los casos de *Fallbrook Irr. Dist.* v. *Bradley,* 17 Sup. Ct. 56, 164 U. S. 112, 41 L. Ed. 369; *Turlock Irr. Dist.* v. *Williams,* 76 Cal. 360, 18 P. 379.

El Título 43 del Código de Leyes de los Estados Unidos lee "Terrenos Públicos". El capítulo 12 de ese título lleva el epígrafe "Reclamación y Regadío de Terrenos por el Gobierno Federal" y es conocido con el nombre de "Ley de Reclamación de Terrenos". Contiene disposiciones como las siguientes:

"Sec. 373.—El Secretario del Interior queda por la presente autorizado para realizar y ejecutar cuantos actos fuere menester y para preparar las reglas y reglamentos que sean necesarios y propios para poner en toda su fuerza y vigor las disposiciones de este capítulo.

"Sec. 374.—Cuando en opinión del Secretario del Interior cualesquiera terrenos . . . no sean necesarios . . . dicho Secretario del Interior puede hacer que esos terrenos . . . sean tasados y . . . vender los mismos ... .

". . . el Secretario del Interior queda autorizado . . . para traspasar todo derecho e interés que tengan los Estados Unidos en tales terrenos . . . sujetos sin embargo a aquellas reservas, limitaciones o condiciones que el referido Secretario crea convenientes . . ."

Al Secretario del Interior se le da plena facultad para determinar si los dueños de tierras situadas dentro de un distrito de regadío pueden retenerlas o si han de venderlas.

La sección 418 provee:

"Antes de otorgarse cualquier contrato o de iniciarse el trabajo para la construcción de cualquier proyecto de reclamación de terrenos, adoptado con posterioridad al 13 de agosto, 1914, el Secretario del Interior exigirá que los dueños de terrenos privados sujetos al mismo, convengan en vender todos aquellos terrenos en exceso del área que él considere suficiente para el sostenimiento de una familia en los terrenos en cuestión, bajo las condiciones fijadas por él y a un precio que no excederá aquél que el Secretario del Interior fije; y si cualquier terrateniente se negare a allanarse a los requisitos fijádosle por el Secretario del Interior, sus terrenos no serán incluídos dentro del proyecto al ser éste adoptado para su construcción."

También se da pleno poder al Secretario del Interior para que determine "el cargo que se hará por acre . . . en terre-

nos pertenecientes a particulares, que puedan ser regados por las aguas de dicho proyecto de regadío, y el número de plazos anuales en que el referido cargo será pagado, así como el día en que comenzarán tales pagos.'' Sec. 419.

La sección 462 también dispone el pago de los gastos de sostenimiento.

En un gran número de casos la ley sobre reclamación de terrenos ha sido llevada a las cortes y sus disposiciones han sido sostenidas. En ningún caso ha sido atacada porque delega indebidamente poderes legislativos al Secretario del Interior; y los actos del Secretario han sido repetidamente confirmados por dichas cortes por estar dentro del límite de las atribuciones conferídasle.

En el caso de *Swigart* v. *Baker,* 229 U. S. 187, se resolvió que el Secretario del Interior de los Estados Unidos estaba autorizado por la Ley de Reclamación de Terrenos (32 Stat. 388, 1093) para imponer el costo de sostenimiento, así como el de la construcción, a pesar de que la ley sólo dice que el Secretario puede imponer *(assess)* ''el costo de la construcción del proyecto''. La corte dijo:

''. . . La frase no está expresamente definida y siendo general en sus términos, no está necesariamente limitada a la construcción, sino que puede incluir la conservación y sostenimiento de lo construído.''

Los casos resueltos por la Corte Suprema de Puerto Rico en torno a la cuestión de delegación de poderes han sido muy pocos. *Pueblo* v. *Neagle,* 21 D.P.R. 356; *Pueblo* v. *Ramírez,* 42 D.P.R. 80; *Feliciano* v. *López,* 44 D.P.R. 937; *Pueblo* v. *White Star Bus Line, Inc.,* 45 D.P.R. 148; *M. Taboada & Cía.* v. *Rivera Martínez, Comisionado del Trabajo,* 51 D.P.R. 253 y *Sifre* v. *Pellón,* 54 D.P.R. 587. De éstos, sólo el primero tiene importancia en el presente caso.

El caso de Neagle envolvía la constitucionalidad de un estatuto (Ley de agosto 12, 1913, Sesión Extraordinaria de 1913, pág. 93, Ley núm. 134) que autorizaba al Tesorero de Puerto Rico a clasificar los distintos negocios en clases.

Copiamos de la opinión:

" . . . El demandado admite que las legislaturas pueden adoptar tipos básicos y dejar a los funcionarios administrativos el deber de ejecutar los detalles para que la ley sea efectiva. Alega él, sin embargo, que la Legislatura de Puerto Rico no ha fijado ese tipo básico dentro de la significación de la jurisprudencia que el gobierno en su alegato cita. Daremos un resumen de estas decisiones."

Después de examinar las autoridades la corte dijo:

" . . . Tampoco podemos apreciar qué importa el que el Tesorero esté investido de amplias facultades discrecionales siempre y cuando que tales facultades sean administrativas y no legislativas. El eje de la cuestión siempre es si de acuerdo con las palabras de la ley y la historia legislativa del país las facultades delegadas han sido administrativas y no legislativas. Hemos citado un caso específico, o sea el de *Ould & Garrington* (v. *City of Richmond,* 23 Gratt. (Va.) 464, 14 Am. Rep. 139). El demandado no trata de establecer distinción entre ese caso y el de autos, sino que ataca sus razonamientos. Tal vez el razonamiento no sea enteramente satisfactorio, pero la sentencia es un hecho y una corte de los Estados Unidos ha resuelto que facultades semejantes a las concedidas por la Ley Núm. 134 al Tesorero de Puerto Rico son administrativas y no legislativas."

En el caso de autos hallamos que las cortes de otras jurisdicciones han declarado válidos estatutos de la misma índole que el presente. Los amplios poderes del Secretario del Interior de los Estados Unidos han sido ampliados aun más por interpretación judicial. *Swigart* v. *Baker,* supra.

En la opinión emitida en el caso de Neagle, supra, se citan varios casos y se copia en parte el caso de *Chicago & Northwestern Railway Co.* v. *Day,* 35 F. 874. Todos estos casos tienden a sostener la contención de que en el presente al igual que en el de Neagle, la delegación fué de poderes administrativos más bien que de poderes legislativos.

Conforme veremos más tarde por la misma ley, lo que el Comisionado hace es llenar detalles. Copiamos de la opinión de la Corte de Circuito de Apelaciones:

"Al determinarse la suma que se ha de recaudar, se ordena al Tesorero de Puerto Rico que tome la cantidad estimada por el Comi-

sionado del Interior para sufragar el costo de explotación y sostenimiento del sistema de regadío para el año fiscal siguiente (estimado del Comisionado que será preparado y certificado en la forma provista por la sección 11 de la Ley Núm. 128 de agosto 8, 1913), y agregar o rebajar a este estimado, según sea el caso, cualquier déficit o superávit que resulte de la explotación y sostenimiento del sistema durante el año anterior. El Tesorero entonces dividirá la suma así determinada por el número total de acres (determinado en la forma prescrita por la ley) a fin de conocer la contribución por acre que deberá imponerse durante el año económico siguiente a los terrenos fuera del distrito que no están sujetos al pago de una contribución para sufragar el costo del sistema.

"El precepto impugnado de la sección 2 de la Ley núm 49, por delegar poderes legislativos, es aquel que requiere del Tesorero al determinar el tipo para fijar la contribución que tome 'la cantidad estimada o certificada como estimada por el Comisionado del Interior para sufragar el costo de explotación y sostenimiento del sistema de regadío para el año fiscal siguiente.' Se sostiene que la Asamblea Legislativa podía imponer y autorizar la contribución en cualquiera de las dos formas. Que ella misma podía imponer un tipo fijo que tendría que ser pagado por acre-pie por las personas que recibieran el agua, o que ella misma podía determinar la cantidad de dinero a ser recaudada para el año siguiente para sufragar los gastos de sostenimiento y explotación, pero que ella no podía delegar la determinación de esa suma, y en su consecuencia, el tipo a fijarse, a la discreción del Comisionado del Interior; que la determinación de la cantidad a recaudarse o el tipo de contribución es cuestión legislativa que envuelve discreción que el poder legislativo no puede delegar a funcionarios administrativos.

"Los letrados de la parte demandante, sin embargo, sostienen que la determinación de la *suma a recaudarse* para un año sucesivo es cuestión puramente de computación, y que la ley ha indicado cómo se hará esa computación." *People* v. *Havemeyer,* supra.

Si el cálculo es demasiado alto o demasiado bajo, habrá por resultado un sobrante o un déficit. El sobrante será acreditado al presupuesto del siguiente año, reduciéndose así la contribución: cualquier déficit será cargado al cálculo del siguiente año. Así, pues, todo error cometido por el Comisionado será automáticamente corregido al prepararse el próximo presupuesto. Se verá que la discreción del Comi-

sionado no juega un papel importante en la computación de la cuota. En verdad, el papel del Comisionado podría ser eliminado y el costo de sostenimiento calculado en alguna otra forma. Por ejemplo, el presupuesto de un año anterior sería tomado como tentativo para el siguiente. Tal procedimiento es seguido al calcularse los tipos de primas para el Fondo del Seguro del Estado.

El terrateniente paga la cuota en cuya ·computación se usa el informe del Comisionado. Pero toda vez que cualquier diferencia resultante entre ese cálculo y el verdadero costo de sostenimiento es ajustado, el terrateniente paga en realidad por el costo exacto de sostenimiento.

Además, no se ha alegado, ni siquiera sugerido, que los cálculos del Comisionado son injustos o confiscatorios.

Resolvemos, en su consecuencia, que la ley no contiene una indebida delegación de poderes.

En lo que concierne a la otra contención, o sea que se menoscaban los contratos, creemos igualmente que ésta carece de méritos.

Los contratos no dicen que El Pueblo de Puerto Rico se obligue a no imponer contribuciones. En realidad aun si se hubiera insertado semejante cláusula, entendemos que ella hubiera sido nula.

Otro punto suscitado por el apelante es que la apelada dejó de probar sus concesiones en la corte inferior. Si bien es cierto, conforme alega la apelada, que el apelante aceptó y admitió la existencia de tales concesiones, nada se ha traído ante este tribunal o ante cualquiera de los otros que han intervenido en el caso, que demuestre que las mismas disfrutaban una exención contributiva. Conforme revelan los autos, éstas son concesiones ordinarias de aguas, similares a un número de concesiones hechas a terratenientes en esta Isla y en España. La única disposición de que tenemos conocimiento en lo que a contribuciones se refiere, es una sección en la primitiva ley de aguas mediante la cual la Corona se obligaba a no aumentar las contribuciones a las

tierras que disfrutaban de la concesión durante el término de diez años.

El caso de la apelada podría ser fortalecido si la contribución impuesta—cargos para el sostenimiento del sistema—fuera considerada como un pago por el agua recibida por los terratenientes del sistema de regadío. Podría decirse entonces que la apelada no tiene que comprar agua y que en su consecuencia no debe pagar por la misma. Mas la teoría es distinta. Copiamos de Corpus Juris:

"Si bien se ha dicho en términos generales que el beneficio que el terreno recibe no es la fuente de la facultad de aforarlo para fines de regadío, hablando generalmente, la justificación y autoridad para el avalúo o para la imposición de contribuciones por parte de un distrito de regadío o similar, surge de los beneficios que el gasto de la contribución o avalúo otorga a los terratenientes dentro del distrito, y una contribución o avalúo sin el consiguiente beneficio o enteramente fuera de proporción con los beneficios conferidos, como cuando el avalúo se basa en un área en exceso de la poseída, no puede sostenerse aunque el hecho de que no haya un beneficio suficiente para sostener todo el avalúo no relevará al terrateniente del deber de pagar aquella parte del avalúo que esté sostenida por un beneficio." 67 C. J. 1341, párr. 932.

El texto está sostenido por *In Re Bonds of Madera Irr. Dist.*, 92 Cal. 296, 28 P. 272, 275, 14 L.R.A. 755; *American Falls Reservoir Dist.* v. *Thrall*, 39 Idaho 105, 228 P. 236; *Cosman* v. *Chestnut Valley Irr. Dist.*, 74 Mont. 111, 238 P. 879, 40 A.L.R. 1344.

"Hablando en términos generales la palabra 'beneficio' tal cual la misma se usa en una disposición estatutaria que exige que los avalúos (*assessments*) estén en proporción con los beneficios recibidos, será interpretada como que significa aquellos beneficios que tiendan a promover la prosperidad del distrito y a aumentar los valores de la propiedad. Hablando generalmente, la teoría de avalúos para beneficios, es que el terrateniente ha recibido por razón del sistema de riego un aumento en el valor del mercado de su propiedad y que ese aumento fija el alcance del beneficio, aunque existe autoridad al efecto de que el valor en el mercado de terrenos situados dentro de un distrito de regadío no es concluyente sobre la cuestión de que los beneficios son

iguales al cargo, y que puede haber un beneficio material sin que haya prueba de un aumento correspondiente del valor en el mercado." 67 C. J. 1347, párr. 945.

El texto está sostenido por *Colburn* v. *Wilson*, 24 Idaho 94, 132 P. 579; *Union Trust Co.* v. *Carnhope Irr. Dist.*, 132 Wash. 538, 232 P. 341; *In re Goshen Irr. Dist.*, 42 Wyo. 229, 293 P. 373.

Se ha decidido repetidamente que las contribuciones no tienen que equivaler al valor del agua utilizada por el terrateniente.

". . . el dueño de terrenos regables dentro de un distrito debe responder de la contribución anual fijada para la explotación y sostenimiento del sistema, cuando el agua se le suministre para ese fin aunque no la utilice." *Otis Orchards Co.* v. *Otis Orchards Irr. Dist.*, *No. 1*, 124 Wash. 210, 215 P. 24, 25.

En el caso de *Nampa & Meridian Irr. Dist.* v. *Petrie*, 28 Idaho 227, 153 P. 425, 429, la Corte Suprema de Idaho declaró válido un precepto que otorgaba derechos de agua a terratenientes para sólo 160 acres, a pesar de que imponía contribuciones sobre toda el área de su finca, de acuerdo con los beneficios. Este caso fué seguido en el de *Saylor* v. *Gray*, 41 Ariz. 558, 20 P. (2d) 441.

Igualmente:

"Un terrateniente no tiene derecho a que sus fincas sean excluídas de un distrito de regadío, fundado únicamente en que tales fincas disfrutan de una concesión individual de aguas. Semejantes fincas se beneficiarían de la habilidad del distrito de regadío de suministrarles agua en épocas de emergencias, de suministrarles servicio mejor o más barato y de ofrecerles energía eléctrica o agua doméstica." *Bleakley* v. *Priest Rapids Irr. Dist.*, 168 Wash. 267, 11 P. (2d) 597.

De todos los casos examinados el que más se asemeja al de autos es el de *Knowles* v. *New Sweden Irrigation District*, 16 Idaho 217, 101 P. 81. Los hechos de ese caso son los siguientes: un tal Scott compró por la suma de $1,800 un derecho de agua a la Great Western Canal Company (institución privada) a virtud del cual él recibía 250 pulgadas

de agua por segundo y por el cual él pagaba determinado canon de arrendamiento anualmente. Más tarde la New Sweden Irrigation District fué organizada bajo las disposiciones de una ley de la Asamblea Legislativa del estado. El distrito de regadío adquirió la Great Western Canal Construction Company. Scott vendió su finca a Knowles. La Junta Directiva del distrito de regadío impuso una contribución a todos aquellos terrenos que estuvieran dentro del distrito, incluyendo la finca de Knowles, con el propósito de pagar los intereses y reducir el principal de ciertos bonos expedidos en pago de la Great Western Canal Company. Knowles pagó bajo protesta e instó demanda para recobrar dicha suma y para impedir mediante *injunction* que el distrito impusiera nuevas contribuciones sobre su finca. El Tribunal Supremo de Idaho dijo:

"Nos parece claro que para la compra de este sistema la querellada no podía legalmente imponer contribuciones sobre la finca del apelante hasta el momento que ella hubiera comprado o adquirido sus derechos y privilegios de agua y la hubiera puesto en el mismo nivel y estado que otros terratenientes y consumidores de agua en el distrito."

La corte dictó sentencia en favor del demandante. Sin embargo, en reconsideración, la corte se revocó a sí misma y dijo:

"Bajo nuestra ley de regadío, tal cual la misma existía al tiempo en que se organizó este distrito, y al imponerse las contribuciones de referencia, si las tierras del demandante fueron debidamente incluídas en dicho distrito de regadío, ellas estaban sujetas a un impuesto por los beneficios, siempre que recibiera algunos, ora el dueño de dichas tierras poseyera un derecho de agua en relación con las mismas o no, toda vez que una persona en un distrito de riego puede recibir ciertos beneficios independientemente de si tiene un derecho de agua en conexión con las mismas o no."

Y luego dice:

"En el caso de *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369, la Corte Suprema de los Estados Unidos tuvo bajo su consideración algunas de las cuestiones envueltas en este

caso, y en él resolvió que terrenos que pueden ser utilizados con ciertos beneficios sin el uso de regadío, pueden ser mejorados en tal forma por éste, que los mismos puedan ser propiamente incluídos en un distrito de riego y aforados para beneficio del regadío artificial como mejora pública; y que bajo la ley de regadío Wright, de California, la Junta estaba obligada a oír la solicitud para la organización del distrito al ser notificada de ella y no tenía el deber de incluir terrenos que no recibieran beneficio alguno; que se desprende necesariamente que una persona interesada tiene derecho a comparecer ante la Junta y a oponerse a los hechos en que se basa la petición, así como a controvertir los beneficios que recibirá determinada finca ubicada dentro del supuesto distrito. Al referirse a la facultad de la Asamblea Legislativa para constituir distritos contributivos la corte dijo: 'Este tribunal ha resuelto que la Asamblea Legislativa tiene facultad para crear tal distrito sin celebración de vista sobre los beneficios, a fin de imponer a los terrenos dentro del distrito el costo de la mejora pública local. Cuando la Asamblea Legislativa fija el distrito ella se supone haber investigado debidamente y haber resuelto de manera definitiva y concluyente la cuestión de los beneficios que habrán de recibir los terrenos situados dentro del distrito, y el ciudadano no tiene derecho constitucional alguno a una vista ulterior sobre la cuestión.'

Luego la corte dijo:

"En el caso de *Pioneer Irrigation District* v. *Bradley*, 8 Idaho 310, 68 P. 295, 101 Am. St. Rep. 201, este tribunal resolvió que la ley de regadío que ahora está bajo nuestra consideración era constitucional. Este caso en manera alguna envuelve la toma de propiedad privada sin el debido proceso de ley ni el menoscabo de la obligación de un contrato. La única cuestión envuelta en dicho caso lo fué la validez de ciertas contribuciones impuestas sobre las tierras del demandante."

En dicho caso la corte de Idaho resolvió que el beneficio recibido por un terrateniente que poseía una concesión de agua era suficiente para que él estuviera sujeto al pago de contribuciones al igual que los otros terratenientes.

En Puerto Rico la Asamblea Legislativa aparentemente en sus decretos considera que los beneficios recibidos por terratenientes que no disfrutan de concesiones de agua o que las disfrutaban y las han entregado, son mayores que los

beneficios recibidos por terratenientes que se encuentran en la posición de la apelada.

Por consiguiente, los primeros tienen que pagar gastos de construcción al igual que de sostenimiento. El estatuto provee:

"Sección 11.—La cantidad que habrá de cargarse e imponerse a un determinado predio de terreno incluído en el distrito permanente de regadío se determinará del modo siguiente:

"El Tesorero de Puerto Rico calculará el importe de los intereses y del capital o fondo de amortización que se adeudare sobre bonos de riego no amortizados correspondientes al entrante año económico y sumará a este importe la cantidad total que se adeudare a cuenta de créditos para el entrante año por razón de derechos o concesiones de agua, y sumará además a esto la cantidad que se calculare y le hubiere sido certificada como calculada por el Comisionado del Interior para el costo de explotación y conservación del sistema del riego para el entrante año eonómico antedicho. Entonces se sumará o restará de la cantidad de ese modo obtenida la suma de cualquier déficit o superávit que se calcule, según sea el caso, que existiere en conexión con el fondo del riego, resultante de las operaciones del corriente año económico. De esta suma deducirá él la cantidad que se calcule y le fuere certificada como calculada por el Comisionado del Interior como ingresos para el entrante año económico, procedente de cualquier planta de fuerza hidráulica que se desarrolle en conexión con el sistema de riego (hasta el tiempo en que la deuda total representada por bonos e incurrida con motivo del sistema del riego se hubiere pagado en su totalidad); y la cantidad calculada y certificádale como calculada por el Comisionado del Interior como ingresos para el subsiguiente año económico procedente de cualesquiera fuentes excepto de la emisión de bonos y de las cuotas especiales que por la presente se disponen para imponerse al terreno en el distrito permanente de regadío. A la cantidad que de ese modo resulte el Tesorero sumará otra cantidad equivalente al dos por ciento del total como margen de seguridad contra morosidad en los cobros; y la cantidad que de este modo se fije por el Tesorero de Puerto Rico, con sujeción a las limitaciones y disposiciones que más adelante constan, será y constituirá la cantidad total del reparto para dicho año económico, la cual se impondrá a los terrenos que estuvieren a la sazón incluídos en el distrito permanente de regadío (incluyendo cualesquiera terrenos per-

tenecientes a El Pueblo de Puerto Rico que formen parte del mencio-
nado distrito, los cuales terrenos serán responsables por y pagarán
las cuotas que se impusieren en virtud de esta Ley en la misma forma
que los demás terrenos comprendidos en el precitado distrito de re-
gadío) . . . (Sesión Extraordinaria de 1913, Ley Núm. 128, pág. 68.)

Los terrenos de la apelada están incluídos en el inciso
4 de la sección 2 de la Ley núm. 49 de 1921, Leyes de ese
año, pág. 368. Éste lee así:

"Sección 2.—La contribución que ha de ser impuesta a cada predio
que recibe agua del Sistema de Riego, pero que bajo la ley vigente
no contribuye a sufragar el costo de dicho sistema, se clasificará como
sigue: el Tesorero de Puerto Rico será el encargado de fijar el nú-
mero total de acres que reciben agua del Sistema de Riego, lo que
incluye: . . . (4) predios de terreno regados por agua suministrada
mediante derechos adquiridos o concesiones que no han sido cedidas,
la cual agua, de acuerdo con los términos de los contratos celebrados
con el Comisionado del Interior, o en virtud de decisiones de la Co-
misión del Riego, se toma y se mide en los ríos en los puntos de tomas
indicados en dichas concesiones; y tales predios serán determinados
dividiendo por cinco el valor de dichas concesiones en acres-pies por
año, según se fija o haya sido fijado por el Comisionado del Interior,
por la Comisión del Riego o por las decisiones de las cortes, en caso
de apelación. El Tesorero de Puerto Rico tomará entonces la canti-
dad estimada o certificada como estimada por el Comisionado del In-
terior, para sufragar el costo de explotación y conservación del Sis-
tema del Riego, durante el año fiscal siguiente (según lo dispone la
sección 11 de la Ley Núm. 128, aprobada en agosto 8, 1913, la cual
enmienda la Ley del Riego aprobada en septiembre 18, 1908), y le
adicionará o le sustraerá, según sea el caso, cualquier déficit o supe-
rávit que resulte entre la cantidad invertida y certificada como in-
vertida por el Comisionado del Interior, en los gastos de explotación
y conservación del Sistema del Riego, durante el año fiscal anterior, y
la cantidad estimada o certificada como estimada por el Comisionado
del Interior para sufragar el costo de explotación y conservación del
Sistema del Riego durante el mencionado año fiscal anterior. El Te-
sorero dividirá entonces la cantidad en tal forma determinada, por
el número total de acres computados según lo previsto anteriormente,
y el resultado deberá ser y constituirá la contribución por acre que se
impondrá durante dicho año fiscal subsiguiente a todos los predios

que se proveen de agua del Sistema del Riego Público de la costa Sur, y que en ninguna otra forma están sujetos al pago de contribución para atender al costo de dicho Sistema del Riego . . ."

Finalmente, para sostener la constitucionalidad de la ley citaremos de la opinión emitida por la Corte Suprema de los Estados Unidos en el caso de *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, 176:

". . . Asumamos que la única teoría en que pueden subsistir estos cargos para mejoras locales es que los mismos son impuestos por razón de los beneficios recibidos y que ningunos terrenos en justicia deben ser gravados por una suma mayor que los beneficios por éstos recibidos, sin embargo, es claro que el importe de los beneficios no es susceptible de ser determinado con certeza geométrica. Hay que utilizar algún método para determinar esa suma, y ese método puede ser más o menos exacto en distintos casos que envuelven distintos hechos. Hay que hacer una elección, y cuando se ha resuelto legalmente que todos los terrenos reciben algún beneficio, ¿podría decidirse que la adopción de un sistema *ad valorem* de imponer contribuciones a las fincas infringe la Constitución federal? Nos parece claro que no es así. El determinar la suma justa y razonable y la proporción que debe ser impuesta a los terrenos con relación a los beneficios recibidos, es una cuestión de detalle que está abierta a la discreción de la legislatura estatal y con la cual esta Corte no debe tener intervención. El modo de llegar a esta suma puede ser en algunos casos inequitativo y desigual, pero está lejos de llegar al nivel de un problema constitucional y muy lejos del caso de privación de propiedad sin el debido proceso de ley."

 ✻ ✻ ✻ ✻ ✻ ✻ ✻

En la página 174:

"En la ley que está bajo nuestra consideración, sin embargo, el establecimiento de sus líneas divisorias y los fines para los cuales se crea el distrito, de ser finalmente organizado por el voto del pueblo, serán necesariamente seguidos por, y tendrán por resultado, la imposición de contribuciones sobre todas las tierras incluídas dentro de los límites del distrito. Así, pues, la Asamblea Legislativa dispone substancialmente no sólo la creación de una corporación pública, sino de un distrito contributivo cuyos límites son fijados, no por la Asamblea Legislativa misma, sino, luego de una vista, por la Junta de Supervisores, sujeto a la aprobación final del pueblo en unas elecciones

convocadas para ese fin. Este tribunal ha resuelto que la Asamblea Legislativa tiene facultad para crear tal distrito sin celebración de vista sobre los beneficios, a fin de imponer a los terrenos dentro del distrito el costo de la mejora pública local. Cuando la Asamblea Legislativa fija el distrito, ella se supone haber investigado debidamente y haber resuelto de manera definitiva y concluyente la cuestión de los beneficios que habrán de recibir los terrenos situados dentro del distrito, y el ciudadano no tiene derecho constitucional a una vista ulterior sobre la cuestión. El derecho que el ciudadano tiene luego es a que se celebre una vista sobre la cuestión relativa a la distribución de la contribución, es decir, sobre el importe de la contribución que él tiene que pagar. *Paulsen* v. *Portland,* 149 U. S. 30, 41. Pero cuando, como ocurre en este caso, la determinación de la cuestión de qué terrenos estarán incluídos dentro del distrito sólo ha de resolverse después que se decida cuáles de los terrenos descritos en la petición resultarán beneficiados, y la decisión de esa cuestión es sometida a algún tribunal (Junta de Superintendentes en este caso), las partes cuyas tierras son así incluídas en la petición tienen derecho a que se celebre una vista sobre la cuestión de beneficios y a que los terrenos sean excluídos si a juicio de la junta esos terrenos no reciben beneficio alguno. A menos que la Asamblea Legislativa decida de por sí la cuestión de beneficios, el terrateniente tiene derecho a ser oído sobre esa cuestión antes de que puedan tomarse sus terrenos. Esto fué, en síntesis, resuelto por las decisiones de este tribunal en *Spencer* v. *Merchant,* 125 U. S. 345, 356, y *Walston* v. *Nevin,* 128 U. S. 578. La ley provee en debida forma la celebración de tal vista y el oportuno aviso.''

\* \* \* \* \* \* \*

En la página 177:

"En el caso de *Davidson* v. *New Orleans,* supra, (96 U. S. 97), la imposición de contribuciones con que este tribunal se negó a intervenir fué hecha para una mejora local (reclamación de terrenos pantanosos) y por el artículo 8 de esa ley de la Asamblea Legislativa de Louisiana, aprobada en 1858, Leyes de Louisiana, 1858, 114, se impuso tal contribución uniforme a cada 'pie cuadrado superficial de terreno situado dentro de la sección o distrito de desagüe de tal junta', necesaria para cubrir el costo de construcción. El efecto de esta disposición fué que cada pie cuadrado de terreno en todo el distrito pagó la misma suma que cualquier otro pie cuadrado, aunque los cargos se basaban en la teoría de una imposición de contribuciones por beneficios. Se adujo que los cargos impuestos a los te-

rrenos del demandante eran excesivos y que parte de esos terrenos no recibían beneficio alguno. A ello se replicó que era cuestión de detalle en lo que a esta corte concernía, es decir, que no se trataba de una cuestión constitucional y por ende que no era revisable por este tribunal. 96 U. S. pág. 106.

"En *Walston* v. *Nevin*, 128 U. S. 578, se impuso una contribución sobre terrenos por los beneficios recibidos en la construcción de una mejora local, a base del número de pies cuadrados pertenecientes al dueño. Se alegó que no era una imposición que se regía por la cantidad de beneficios recibidos sino un cargo enteramente arbitrario e ilegal. Este tribunal resolvió que la objeción carecía de fundamento y que la cuestión era una a ser resuelta por el poder judicial, cuerpo que tenía discreción para disponer la forma en que se debía efectuar el pago de la mejora.

"Nos referimos al caso de *Cleveland* v. *Tripp*, 13 R. I. 59, resuelto en 1880, como que trata de la materia con mucha habilidad. La ley disponía la construcción de un alcantarillado en la ciudad de Providence y ordenaba la imposición de una contribución sobre los terrenos adyacentes, ascendente a determinada suma por cada pie de frente y de otra suma por cada pie cuadrado hasta una distancia de 150 pies. Se sostuvo que esa forma de fijar el impuesto no aplicaba la contribución en proporción a los beneficios recibidos, que era desigual e irrazonable, y, en su consecuencia, inconstitucional. Aunque la corte admitió que la cuestión de desigualdad estaba bien fundada, resolvió, sin embargo, que la ley estaba dentro de los poderes legislativos.

"Existen algunos estados donde las contribuciones impuestas bajo circunstancias similares a las aquí existentes y sobre una base *ad valorem* han sido declaradas nulas por infringir algún precepto de la constitución estatal o por violar la ley bajo la cual fueron impuestas. Los letrados han citado varias de esas decisiones en los alegatos radicados. No hallamos, ni se ha llamado nuestra atención a él, ningún caso de este tribunal en que se haya resuelto que semejante imposición de contribuciones viole algún precepto de la Constitución federal. Si no lo viola, esta corte no puede conceder remedio alguno.

"El método de imponer la contribución provisto por la ley que está bajo nuestra consideración tal vez no sea el mejor que pudo ser adoptado para realizar la justicia más igual y exacta que la naturaleza del caso permite. Pero no obstante no nos es posible decir que es contrario a algún precepto de la Constitución federal, y por ello, debemos resolver que la objeción aquí levantada es insostenible.

"Se levanta también la objeción de que se está delegando a otros un derecho legislativo tal como es la constitución de corporaciones públicas, por cuanto la ley crea en los supervisores y terratenientes el derecho a decidir si tal corporación debe ser creada, y se dice también que la legislatura no puede delegar sus poderes en esa forma y que cualquier acto realizado por tal corporación por el cual se prive de su propiedad a un ciudadano a través del derecho de dominio eminente o a través de tasac'ón resulta en una privación de tal propiedad sin el debido proceso de ley.

"No creemos que haya validez alguna en el argumento. La legislatura no delega poder alguno. Ella fija condiciones que, al ser cumplidas, tienen el efecto de que la corporación se entenderá constituída con los poderes mencionados y estatuídos en la ley.

"Después de un cuidadoso estudio de las objeciones levantadas a esta ley nos vemos obligados a concluir que ninguna de dichas objeciones tiene fundamento. Por lo tanto, se revoca la sentencia apelada y se devuelve el caso a la Corte de Circuito de los Estados Unidos para el Distrito Sur de California para ulteriores procedimientos no inconsistentes con esta opinión."

La alegación de prescripción levantada por la demandada debe ser cuidadosamente estudiada. Excepto en los términos antes mencionados, la corte de distrito no pasó sobre la misma.

El Tesorero trató de cobrar la contribución. Russell & Co. radicó una petición de *injunction* ante la Corte de Distrito de los Estados Unidos para Puerto Rico. El caso había sido apelado a la Corte de Circuito de Apelaciones cuando el Congreso, en marzo 4 de 1927, enmendó el artículo 48 del Acta Orgánica y prohibió la expedición de autos de *injunction* para impedir el cobro de contribuciones. El procedimiento pendiente en la Corte de Circuito de Apelaciones fué desestimado—*Gallardo* v. *Havemeyer*, 21 F. (2d) 1012—en noviembre 3, 1927.

En abril 23 de 1928 el Congreso aprobó la Ley núm. 302, que proveía que todas las contribuciones que habían sido objeto de procedimientos de *injunction* debían ser cobradas "mediante juicio en derecho en vez de mediante embargo, secuestro, apremio o cualquier otra forma de procedimiento

administrativo sumario. No obstante las disposiciones de cualquier ley de prescripción en vigor, todo pleito de esa índole puede entablarse en cualquier tiempo dentro del año siguiente a la aprobación de esta ley''.

Esta última oración no significa, como sostiene la apelada, que las demandas debían ser entabladas antes de abril 23, 1929. El efecto de este estatuto fué otorgar un término adicional de un año al Tesorero para recaudar a través de juicio en derecho contribuciones que habían prescrito bajo las leyes corrientes por razón de los procedimientos de *injunction.*

La ley que establece esta contribución especial no contiene una disposición similar a la ley de contribución sobre ingresos y otras que proveen que el Tesorero deberá cobrarlas dentro de cierto término. Si el Congreso no hubiera otorgado ese año de gracia al Tesorero, tal vez se habría visto impedido de cobrar algunas otras contribuciones, pero no ésta.

Sostenemos, por tanto, que la acción no está prescrita.

*La sentencia de la Corte de Distrito de San Juan debe ser revocada y en su lugar se dictará otra ordenando que Russell & Co. deberá pagar al demandante las sumas especificadas en la demanda.*

El Juez Asociado Sr. De Jesús no intervino en la decisión de este caso por haber resuelto como Juez de Distrito una excepción previa sosteniendo la suficiencia de la demanda.